NASHVILLE CITY BANK AND TRUST CO., Plaintiff,

v.

Anna Jensen MASSEY, Defendant.

NASHVILLE CITY BANK AND TRUST CO., Plaintiff,

v.

RELIABLE TRACTOR, INC., Defendant.

NASHVILLE CITY BANK AND TRUST CO., Plaintiff,

v.

E. Ray JENSEN, Defendant.

NASHVILLE CITY BANK AND TRUST CO., Plaintiff,

v.

PIEDMONT, INC., et al., Defendants.

NASHVILLE CITY BANK AND TRUST CO., Plaintiff,

v.

ALBANY TRACTOR CO., Defendant.

NASHVILLE CITY BANK AND TRUST CO., Plaintiff,

v.

FLINT EQUIPMENT CO., Defendant.

NASHVILLE CITY BANK AND TRUST CO., Plaintiff,

v.

Mary Jensen RAINEY, Defendant.

No. 80–26–VAL.

United States District Court,
M. D. Georgia,
Valdosta Division.

June 3, 1982.

J. Randolph Pelzer, North Charleston, S. C., for plaintiff.

Bob Reinhardt, Tifton, Ga., for defendant.

OWENS, Chief Judge:

In these non-jury consolidated civil actions Nashville City Bank and Trust Company of Nashville, Tennessee sues defendants Anna Jensen Massey, Reliable Tractor, Inc., E. Ray Jensen, Piedmont, Inc., William H. Arnold, Albany Tractor Company, Flint Equipment Company, and Mary Jensen Rainey, alleging that each of the defendants except Piedmont, Inc. and William H. Arnold, on or about September 24, 1974, executed in favor of and delivered promissory notes[1] in varying amounts due and payable November 15, 1975, to Oak Winds, a Florida Limited Partnership; that each of said notes was endorsed by W. R. Thigpen, general partner of said limited partnership, to the plaintiff bank on or about April 10, 1975; and that each of said notes, despite demand made after maturity, has not been paid and is now due and owing to the plaintiff bank as holder.

Each of said defendant obligors admits the execution and delivery of said promissory notes but denies any liability to plaintiff bank alleging as defenses that plaintiff bank is not a holder in due course because it took each instrument as security for the general partner's personal loan and others with actual or constructive knowledge of defenses and claims with respect thereto; that plaintiff bank holds said instruments subject to all defenses which defendants have against W. R. Thigpen, plaintiff's predecessor in interest; and each defendant

---

1. The promissory notes were in the following amounts:

| Anna Jensen Massey | $10,000.00 | Albany Tractor Co | $40,000.00 |
| Reliable Tractor, Inc. | $80,000.00 | Flint Equipment Co. | $40,000.00 |
| E. Ray Jensen | $10,000.00 | Mary Jensen Rainey | $10,000.00 |

is not liable to W. R. Thigpen because of several defenses including that the limited partnership has been paid in full for the amounts due under each instrument.

Defendants Piedmont, Inc. and W. H. Arnold are sued in their capacities as general partners of Oak Winds, a Limited Partnership, for coming into the possession of money of the limited partnership, which defendants allege they were legally obligated to pay but did not pay to plaintiff bank as successor in interest to and holder of said promissory notes, including a $10,000.00 note signed by W. E. Currie, a Florida citizen, who is being sued in a Florida court. Defendants admit that each maker of each of said notes which total $200,000.00[2] in principal amount, executed and delivered a check to Oak Winds, a Limited Partnership, in payment of his respective note about the time the notes became due in November, 1975. Defendants assert that W. R. Thigpen was not authorized to endorse and pledge said partnership notes as collateral for his personal indebtedness to plaintiff bank; that plaintiff bank acquired neither a security nor property interest in said notes and checks; and that there was no legal obligation upon defendants to pay any of said partnership money to plaintiff bank.

The evidence has been heard and submitted by deposition and exhibits. Arguments of counsel and briefs have been considered. This, together with the aforesaid, constitutes the court's required findings of fact and conclusions of law.

### Holder in Due Course Status?

The first question for decision is whether or not the plaintiff bank is a holder in due course of each promissory note and thus not subject to defendants' defenses and claims against W. R. Thigpen. If the plaintiff bank is a holder in due course, the defendants will be required to pay the plaintiff bank. If the plaintiff bank is not a holder in due course, the further question of whether or not defendants are liable to plaintiff bank in any amount must be decided.

### Findings of Fact

On December 14, 1973, W. R. Thigpen of Aiken, South Carolina, as the sole general partner and W. R. Thigpen and John J. Simons, Jr., also of Aiken, South Carolina, as the original limited partners, pursuant to the Uniform Limited Partnership Act of the State of Florida, entered into a Certificate and Agreement of Limited Partnership for Oak Winds, a Limited Partnership. On December 28, 1973, said Certificate and Agreement were filed with Florida's Secretary of State. The stated purpose and business of the partnership was "to develop, construct, own, maintain and operate a 456 unit multi-family rental housing development on certain real property in the City of Clearwater, Pinellas County, Florida. . ." Sec. 2.01 of Restated Certificate.

W. R. Thigpen then resided in and did business as a real estate developer and syndicator out of his office in Aiken, South Carolina. He conducted his business as a sole proprietor doing business as Real Estate Investment Company. John J. Simons was one of Mr. Thigpen's employees. In various capacities Mr. Thigpen had been a real estate developer and syndicator since 1955; including Oak Winds he put together approximately twenty-two private and one SEC real estate offerings.

At the time Mr. Thigpen and Mr. Simons formed Oak Winds, a Limited Partnership, Mr. Thigpen was also involved in other real estate limited partnerships. The Atlanta law firm of Hansell, Post, Brandon and Dorsey, through its partner C. L. Wagner, represented Mr. Thigpen and did legal work for each limited partnership including Oak Winds.

Mr. Thigpen, as general partner of Oak Winds, secured a commitment for a permanent real estate loan, closed a construction loan, and on March 11, 1974, entered into a

---

**2.** Only $190,000.00 in principal amount of these notes is the subject of this lawsuit. The facts, however, encompass all of said notes.

construction contract with Joe M. Rodgers and Associates, Inc. of Nashville, Tennessee.

In August or September, 1974, DeNean Stafford—a substantial businessman of Tifton, Georgia, who is a major stockholder in and president of each defendant corporation which signed a promissory note—was told by Robert L. Marchman III, a Hansell-Post partner, who represented Mr. Stafford, of Mr. Thigpen's desire to bring limited partners into Oak Winds. With consent and request of all for Hansell-Post to represent all parties, a Restated Certificate and Agreement of Limited Partnership of Oak Winds, a Limited Partnership, was prepared and executed on September 24, 1974, as of January 1, 1974. As is shown by that Restated Certificate and Agreement, W. R. Thigpen remained as sole general partner; W. R. Thigpen and John J. Simons, Jr. withdrew as original limited partners; Reliable Tractor, Inc., Albany Tractor Company, Flint Equipment Company, W. E. Currie, Jr., E. Ray Jensen, Mrs. Mary Jensen Rainey, and Anna Jensen Massey became additional limited partners; and the additional limited partners agreed to make capital contributions totalling $700,000.00. The limited partners received 99 capital units paying $7,070.71 for each as follows: $2,525.25 in cash; $4,545.46 by promissory notes payable to the partnership (a) $1,010.10 November 15, 1974, (b) $1,515.15 January 15, 1975, and (c) $2,020.21 November 15, 1975.

On December 6, 1973—prior to the formation of Oak Winds, Ltd. on December 14, 1973—Mr. Thigpen furnished a personal financial statement to the Southeast National Bank of Dunedin, Florida and the bank agreed to make a $350,000.00 unsecured personal loan due in September, 1974, to him. The total of $350,000.00 was disbursed to Mr. Thigpen by December 12, 1973, so that when defendants became limited partners in Oak Winds, Ltd. Mr. Thigpen was already indebted to Southeast National Bank of Dunedin. When the loan became due on September 2, 1974, Mr. Thigpen was unable to pay Southeast National Bank of Dunedin. According to the bank's internal memo of October 7, 1974, Mr. Thigpen told the bank his inability resulted from his having not consummated an anticipated sale of a 50% interest in Oak Winds, Ltd. to the defendant limited partners. Mr. Thigpen succeeded in getting the bank to extend the maturity of his debt until February 15, 1975, by agreeing to collateralize his unsecured loan by pledges of monies due between January 1 and January 30, 1975, from investors in Oak Winds, Ltd. and four other limited partnerships, in each of which Mr. Thigpen was the managing general partner. For that purpose Mr. Thigpen as managing general partner of each limited partnership executed a hypothecation agreement by which each of the five limited partnerships pledged certain subscription agreements and promissory notes given by limited partners. Among the pledged notes were defendants' notes due January 15, 1975; the remainder of defendants' notes were not pledged. Neither defendants nor their attorneys were ever notified by Mr. Thigpen or the bank of the pledge. Mr. Thigpen thereafter paid the bank: January 14, 1975, $100,000.00; February 6, 1975, $173,666.00; February 7, 1975, $23,666.00; February 14, 1975, $23,666.00; April 14, 1975, balance of $29,002.00 plus interest. The source of Mr. Thigpen's funds used to make these payments is not shown by the evidence.

Coopers and Lybrand, Certified Public Accountants, examined the financial statements of Oak Winds, Ltd. for the period December 14, 1973, to October 31, 1974. A report of that examination dated January 16, 1975, was transmitted to defendants' agent, Mr. Stafford, on February 13, 1975. The entire report was preceded by the following:

"To the partners
Oak Winds, A Limited Partnership

We have examined the statement of assets, liabilities and partners' deficit of Oak Winds, A Limited Partnership, as of October 31, 1974, *and the related statements* of expenses and changes in partners' deficit for the period December 14, 1973 (date of partnership agreement) to October 31, 1974. Our examination was

made in accordance with generally accepted auditing standards, and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances.

The accounts of the partnership have been maintained and the accompanying financial statements have been prepared on a cash basis of accounting in accordance with methods of reporting utilized for federal income tax purposes. Income and expenses are recognized only as cash is received or paid, and certain prepaid assets and accrued expenses, as described in Note 1 of Notes to Financial Statements, are not reflected in the financial statements. *Accordingly, the above-mentioned financial statements do not present the financial position of Oak Winds, A Limited Partnership, as of October 31, 1974, or the results of its operations for the period then ended in accordance with generally accepted accounting principles.*

In our opinion, the financial statements referred to above present fairly the assets, liabilities and partners' deficit of Oak Winds, A Limited Partnership, as of October 31, 1974, and the expenses and changes in partners' deficit for the period December 14, 1973, to October 31, 1974, in conformity with the method of accounting described in the preceding paragraph.

/s/ Coopers & Lybrand
Atlanta, Georgia
January 16, 1975"    (emphasis added)
and on page 4 included the following explanatory notes:

## "NOTES TO FINANCIAL STATEMENTS

\*    \*    \*    \*    \*    \*

2. Organization and Certain Provisions of the Partnership Agreement:
The limited partnership was formed on December 14, 1973, pursuant to the laws of the State of Florida to construct, own and operate an apartment complex of 456 units in Clearwater, Florida. The limited partnership will be dissolved on Decem-

ber 31, 2025, unless sooner terminated as a result of the occurrence of certain circumstances defined in the limited partnership agreement.

The limited partnership agreement provides for capital contributions of $99 from the general partner and $700,000 from the limited partners. As of October 31, 1974, the partnership had received capital contributions of $300,099, and noninterest bearing notes receivable from limited partners for remaining capital contributions of $400,000. The notes receivable are due $50,000 on November 15, 1974, $150,000 on January 15, 1975, and $200,000 on November 15, 1975. The $150,000 notes receivable due January 15, 1975, have been pledged as collateral for a note payable of the general partner. Notes receivable for capital subscriptions are not reflected in the financial statements."

\*    \*    \*    \*    \*    \*

(emphasis added)

Neither Mr. Stafford nor defendants' attorneys noticed the quoted note or the underlined language prior to the commencement of these lawsuits and their being questioned as witnesses about the said report and its contents.

Around the time (September 24, 1974) that defendants became limited partners in Oak Winds, Ltd., Mr. Thigpen individually went to Nashville, Tennessee to develop a luxury apartment project known as Green Hills. As his December 31, 1974, unsigned statement given to Nashville City Bank shows, he purchased an apartment site for $500,000.00, paid $20,000.00 down and still owed $480,000.00. Having a need for money to put in the Nashville project and being without cash Mr. Thigpen agreed to permit a Nashville mortgage banking firm to secure a mortgage on the apartment project if they would use their best efforts to secure a loan on defendants' notes. A Mr. Eubanks of that firm told Mr. Thigpen that plaintiff Nashville City Bank was willing to make him a loan. Mr. Thigpen was then introduced to Mr. William Tate, a loan officer of plaintiff bank.

Mr. Thigpen directly and through Mr. Eubanks gave plaintiff bank (1) his unaudited, unsigned personal financial statement as of December 31, 1974, which, among other things, shows an accounts receivable of $91,707.00 from Oak Winds; (2) a copy of the Restated Certificate and Agreement of Limited Partnership of Oak Winds, a Limited Partnership; (3) unsigned financial statements on defendants Reliable Tractor, Inc., Flint Equipment Company, and Albany Tractor Company, and a signed financial statement on defendants Jensen, Rainey, and Massey; (4) the promissory notes due November 15, 1975, payable to Oak Winds, a Limited Partnership, and signed by each defendant limited partner; and (5) a Coopers and Lybrand "Report on Examination of Financial Statements (Cash Basis) for the period December 14, 1973 (date of partnership agreement) to October 31, 1974." The plaintiff bank secured Retail Credit Company reports on W. E. Currie, Jr., DeNean Stafford, E. Ray Jensen, Mary Jensen Rainey, and Anna Jensen Massey, and contacted Home Federal Savings and Loan of Nashville and Dunedin Bank of Dunedin, Florida.

The Restated Certificate and Agreement of Limited Partnerships provides, among other things:

### "ARTICLE I

### FORMATION OF THE PARTNERSHIP

"SECTION 1.01. *Formation.* The General Partner and the Original Limited Partners have formed a Limited Partnership (the 'Partnership') pursuant to the *Uniform Limited Partnership Act of the State of Florida* as the same may from time to time have been or be amended (the *'Partnership Act'*).

\*   \*   \*   \*   \*   \*

### ARTICLE II

### PURPOSES AND BUSINESS

"SECTION 2.01. *Purposes of the Partnership.* The purposes and business of the Partnership shall be to develop, construct, own, maintain and operate a 456 unit multi-family rental housing development on certain real property in the City of Clearwater, Pinellas County, Florida, said real property being more particularly described on Exhibit 'B' attached hereto (the 'Property'). Said Property and housing development shall hereinafter be referred to as the 'Project'.

\*   \*   \*   \*   \*   \*

### ARTICLE V

### RIGHTS, POWERS AND DUTIES OF THE PARTNERS

"SECTION 5.01. *Management of Partnership Business.* The General Partner shall be solely responsible for the management of the Partnership business with all rights and powers generally conferred by law or necessary, advisable and consistent in connection therewith.

"SECTION 5.02. *Powers of the General Partner.*

(a) Subject to Section 5.03 hereof, the General Partner shall have all of the powers of the Partnership and shall have and enjoy all of the rights and powers of a partner of a Partnership without limited partners *except as otherwise provided by the Partnership Act.* Without limiting the foregoing, but subject to the provisions of Section 5.03 hereof, the General Partner shall have full power to:

\*   \*   \*   \*   \*   \*

(iv) borrow money, and to issue evidence of indebtedness and to secure the same by mortgage, pledge or other lien, *in furtherance of the Partnership's purposes and business provided the same shall not be prohibited hereunder*;

\*   \*   \*   \*   \*   \*

(ix) open and maintain bank accounts in the name of the Partnership for the deposit of Partnership funds, withdrawals from which shall be made upon such signature or signatures as the General Partner may designate; provided, however, that *no funds or assets of the Partnership,* or deposits given by tenants in the Project, *shall ever be comingled with personal funds, property or deposits of the*

General Partner or any other person or firm;

\* \* \* \* \* \*

(xiii) at any time after the delivery by the Limited Partners of their promissory notes as provided in Section 4.04(b), the General Partner shall have the right *to cause the Partnership to borrow* in a principal amount not in excess of the then outstanding balance of said promissory notes, which loans shall be repaid out of the proceeds of collection of the promissory notes delivered by the Limited Partners. *The Partnership shall have the right to issue evidences of such indebtedness and to secure the same by assignment or pledge* of the above-described promissory notes;

"SECTION 5.03. *Limitations on Powers of General Partner.*

Notwithstanding the provisions of Section 5.02 hereof, *without the prior written consent of Limited Partners* owing seventy-five percent (75%) of the Capital Units (exclusive of Capital Units owned by the General Partner), the General Partner shall not:

(i) *sell, transfer, assign or convey any substantial part of the Partnership's assets* or modify the Lease described in Section 3.01 hereof, or exercise the right to renew the term of said Lease; provided, however, that the foregoing shall not apply to the leasing of space in the Project to occupancy tenants or to the transfer of title to the Property and Project to a nominee of the Partnership in connection with executing a mortgage as security for authorized indebtedness incurred on behalf of the Partnership;

\* \* \* \* \* \*

"SECTION 5.10. *Actions of General Partner. Except where this Agreement expressly provides otherwise,* any person, firm or corporation doing business or otherwise dealing in a transaction with the *General Partner acting on behalf of the Partnership* shall be entitled to rely fully on the General Partner's power and authority to bind the Partnership to such business or transaction.

\* \* \* \* \* \*

"SECTION 8.08. *Transfer of a General Partner's Interest.*

(a) The General Partner *may not sell, transfer, assign, pledge, mortgage, encumber or otherwise dispose of his interest* in the Partnership except as herein provided.

\* \* \* \* \* \*

"ARTICLE XI

MISCELLANEOUS

\* \* \* \* \* \*

"SECTION 11.02. *Applicable Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

"SECTION 11.03. *Entire Agreement.* This Agreement constitutes the *entire agreement and understanding* among the Partners and supersedes all prior agreements and undertakings with respect hereto." (emphasis added).

The Coopers and Lybrand cash basis report, already quoted in part, as Liabilities of the partnership showed:

"LIABILITIES

| | |
|---|---|
| Construction loan | $2,064,719 |
| Advances from general partner | 91,707 |
| Retainage payable | 88,303 |
| Bank overdraft | 108,087 |
| | 2,352,816" |

Mr. Thigpen in his own individual name had already purchased commercial property on Hillsboro Road in the Green Hills area of Nashville, Tennessee, on which he hoped to build and syndicate another apartment complex. On his December 31, 1974, financial statement he shows that property value based on his own appraisal at $500,000.00 and notes and mortgages on the property totalling $480,000.00.

Mr. Thigpen told Mr. Tate and other officers of Nashville City Bank of his intention to develop a Green Hills area apartment complex, of his need for money, of his ar-

rangement with First and Mid-South Mortgage Company to obtain long-term financing and of his plan to obtain $5,000,000.00 construction financing from and with Nashville City Bank if they approved a $185,000.00 personal loan secured by assignment of the subject promissory notes of the defendant limited partners.

Mr. Thigpen also told Mr. Tate that while the Coopers and Lybrand report showed advances by him as general partner of some $91,000.00, "since the time of this report, that he had made the advances to the partnership in excess of $200,000, . . . and that the borrowing and using of these notes as collateral was money that he was entitled to, that he put in to begin with, that the partnership owed him." (Tate deposition, p. 10).

Mr. Tate stated that he was supposed to have the bank's attorneys review the limited partnership agreement and advise as to Mr. Thigpen's authority to assign these notes. Neither the bank's files nor the law firm's files and records contains anything indicating that the bank's law firm reviewed the agreement or advised the bank. The court therefore finds that Mr. Thigpen's loan and assignment was not consummated with approval of bank's counsel.

Neither Mr. Tate nor any other bank official contacted Coopers and Lybrand or anyone else connected with the limited partnership to verify anything Mr. Thigpen said.

Nashville City Bank's executive committee approved the $185,000.00 loan to Mr. Thigpen on April 1, 1975. The loan application shows "Borrower—W. R. Thigpen, P. O. Box 325, Aiken, South Carolina . . . Nature of Business—Real Estate Investor . . . Purpose of Credit—Temporary Operating Capital . . ." The executive committee minutes of April 1, 1975, state:

"EXECUTIVE COMM. 4–1–75. Mr. Tate reviewed with the Committee the affairs of W. R. Thigpen who had been introduced to the bank by First and Mid-South Mortgage Company. Mr. Thigpen, who is soon to develop an apartment house in the Green Hills Area, wished to borrow $185,000 as working capital for a Florida Project, payable in full by 11–15–75. After a thorough discussion, and upon a motion duly made, seconded and passed, this loan was approved as requested. The loan officer was requested by the Committee Chairman to verify two additional credit references, Home Federal Savings and Loan of Nashville, and Dunedin Bank of Dunedin, Florida."

Nashville City Bank did not notify either of the defendant limited partners of its intention to loan Mr. Thigpen $185,000.00 secured by assignment of the notes in question nor did it notify them of the assignment of said notes at any time prior to November 15, 1975, and the maturity of said notes. W. R. Thigpen did not notify[3]

**3.** Nashville City Bank contends that even though neither it nor Mr. Thigpen gave actual notice of the loan and assignments to any limited partners they nevertheless were on notice of Mr. Thigpen's attempts to hypothecate these notes and by failing to prevent his action, tacitly approved these assignments. The basis for this contention is a Coopers and Lybrand internal memo dated February 24, 1975, memorializing a conversation between Mr. Thigpen and Dennis Cooper of Cooper and Lybrand. The first paragraph states:

"Last week in Aiken, I met with Rudy Thigpen and, at his request, discussed the following items relating to the Oak Winds partnership:

1. Rudy is in the process of hypothecating the remaining $185,000 note receivable from the limited partner for capital contributions. I do not believe there is sufficient funds in the project to allow him to pull this money out without jeopardizing the operations of the project. My basis for this statement is the analysis I made to determine use of the funds from initial capital contributions and permanent mortgage (see Exhibit attached). As can be seen from this analysis, $623,603 remains to cover interest during the construction period and to subsidize operations until the project achieves a break-even situation. This amount is well below the $834,221 interest cost originally projected. However, we are aware that interest rates are significantly less than originally projected. Rudy and I attempted to ballpark anticipated interest costs based on the rates currently in effect. We determined that approximately $720,000 in interest would be paid during the construction period. This amount is approximately $100,000 less than the total funds

either of the defendant limited partners of the loan and assignment prior to around November 15, 1975.

On April 8, 1975, the loan was consummated. The promissory note is dated April 8, 1975, and signed W. R. Thigpen. Reference is made to a Collateral Agreement and $185,000.00 Promissory Notes to Oak Winds, a Limited Partnership. Each note is assigned as follows:

"Assignment:

General Partner, W. R. Thigpen, hereby assigns all right, title, and interest in said Promissory Note to Nashville City Bank and Trust Co. with recourse.

By:   /s/ W. R. Thigpen
        Oak Winds, A Limited Partnership
        W. R. Thigpen, General Partner"

The $185,000.00 was disbursed by bank check payable to W. R. Thigpen, who then deposited some $25,000.00 of that amount in a Nashville City Bank checking account in his name doing business as Real Estate Investment Company and purchased another bank check for the remainder, payable to W. R. Thigpen. That check, according to Mr. Thigpen, was deposited in his personal business account in Aiken, South Carolina.

Between April 8, 1975, and the maturity date of Mr. Thigpen's Nashville City Bank loan—November 15, 1975—the Oak Winds Limited Partnership and its general and limited partners found themselves with an

apartment complex that was unfinished and behind in schedule; insufficient undisbursed construction loan proceeds to complete and pay for construction; a permanent loan commitment that contained conditions as to date of completion, success in renting and other items that could not be fulfilled; and disputes between the general partner Mr. Thigpen and the contractor as to a second, until then unknown contract between Mr. Thigpen as general partner and the contractor. After talking with the construction lender and counsel and after coming to the conclusion that Mr. Thigpen had probably assigned defendant limited partners' notes to some unknown bank for some unknown purpose the limited partners decided to put more money into the limited partnership and attempt to complete the project rather than abandon it at that point.

Upon demand of counsel for the limited partners Mr. Thigpen resigned as general partner sometime in October, 1975, and was given a $650,000.00 note from the partnership. At the time the note was given there was no expectation that partnership funds would be available to pay the note. Piedmont, Inc. and W. H. Arnold became the general partners; defendant W. H. Arnold was president of Piedmont, Inc.

The Southeast National Bank of Miami as construction lender agreed not to then fore-

available from the above analysis. I also pointed out that, if the project had to go to GAP financing rather than the 'additional first mortgage' (contingent on rent levels), additional interest cost of $72,000 per year would be incurred due to the difference in interest rates (15 percent GAP as compared to 9 percent first mortgage on $1,200,000). In summary, if the $185,000 note is hypothecated and the funds taken out of the project, additional equity or advances from the partners or outside financing of approximately $285,000, as a minimum, will be necessary to fund the above cost. Rudy indicated that approximately $300,000 in cash flow would be available from operations during this period. However, I cautioned him to review his figures to determine if this amount would still be available considering delays in completing construction. I suggested that he seriously reconsider his decision to pull the funds out of the project at this point."

A copy of the entire memo was sent by Coopers and Lybrand to Mr. Thigpen and to Carroll L. Wagner, Jr., the Hansell, Post, Brandon and Dorsey partner who represented Mr. Thigpen and his many interests. As shown by their internal records, Coopers and Lybrand considered their client to be Mr. Thigpen and his various interests. Neither Coopers and Lybrand nor Mr. Wagner represented the interests of these defendant limited partners or had any authority in their behalf to approve or disapprove of Mr. Thigpen's proposed conduct. *See, Glazer v. J. C. Bradford & Co.*, 616 F.2d 167 (5th Cir. 1980).

Neither Mr. Wagner, Mr. Thigpen, nor Coopers and Lybrand sent a copy of said memo to either of the defendant limited partners nor otherwise notified any of them of the efforts Mr. Thigpen was making to borrow money and hypothecate these notes.

close if the defendant limited partners would pre-pay the partnership their November 15, 1975, notes and the partnership would pay that money to the bank.[4] Between October 28th and November 1st each limited partner paid the full amount of each note by check payable to the limited partnership and "Southeast First National Bank of Miami." The entire proceeds were remitted by Piedmont, Inc. and W. H. Arnold as general partners of the limited partnership to the "Southeast First National Bank of Miami" and used for the construction of Oak Winds. Defendant W. H. Arnold acted as president of the general partner and handled each payment. In spite of that the project was foreclosed upon after involuntary bankruptcy was begun.

Nashville City Bank first learned of the partnership's problems when Mr. Tate on November 16, 1975, contacted Mr. Thigpen, learned of Mr. Thigpen's financial problems, and at Mr. Thigpen's suggestion contacted the limited partners to demand payment and was told they did not believe they were obligated to Nashville City Bank and referred Mr. Tate to their lawyer.

Nashville City Bank sued Mr. Thigpen, got a judgment, and Mr. Thigpen filed in bankruptcy. Nashville City Bank also commenced these lawsuits.

### Conclusions of Law

#### I. *Applicable Law* —

A limited partnership is an artificial legal entity created by a statute or law. While the statutes or laws creating limited partnerships may vary they generally provide for a form or scheme of business organization in which the liability of some of the members—general partners—is unlimited and the liability of other members—limited partners—is limited to a definite amount, usually the amount of the limited partner's capital contribution. The powers, duties, responsibilities, and liabilities of the limited partnership and its general and limited partners are as specified in the statute or

law pursuant to which the limited partnership is organized or created. The Uniform Limited Partnership Act, approved in 1916, has been generally adopted in most of the states of these United States, so that today the laws of the states of these United States are fairly uniform as to limited partnerships. 68 CJS Partnerships § 449, *et seq.*:

> "*Generally, the law governing limited partnerships is that of the jurisdiction under whose laws the partnership was organized* and where the partnership agreement was made, in practically the same way a corporation organized under that law would be governed. The rule has been applied to determine whether a valid limited partnership has been formed, the sufficiency of the special partner's contribution, the construction of the contract between the parties, the extent of the general partners' authority to bind a special partner, the nature of the special partner's interest, the limited liability of the special partner, the effect on the special partner's liability of a failure to comply with the laws of the jurisdiction of organization, and the validity of provisions in a partnership agreement for the continuance of the relation as a limited partnership on the death of a partner. The law of the forum has been applied to determine the necessity of compliance with local statutory requirements for the renewal or continuance as a limited partnership of a firm organized in another jurisdiction and to determine whether a failure to comply with such requirements on the death of the special partner results in a dissolution of the partnership. In the absence of proof of the statute of another state which is claimed to govern the case, it will be presumed that the common law applies." At § 451, p. 1008. (emphasis added—footnotes omitted).

Oak Winds, a Limited Partnership, was organized under the Uniform Limited Partnership Law of the State of Florida. The

**4.** See Plaintiff's Exhibit 51—Carroll L. Wagner's letter of October 20, 1975, to Southeast First National Bank.

authority, rights, responsibilities and liabilities of its general and limited partners are thus governed by the laws of Florida. With this, both the plaintiff and defendants agree.

Plaintiff bank suggests, however, that while the affairs of the limited partnership are generally governed by the laws of Florida, the loan to Mr. Thigpen was made and the assignments of the promissory notes in question took place in Tennessee and should thus be governed by Tennessee law. No authority is cited for this proposition. Defendants oppose this suggestion.

■ The Restated Certificate and Agreement of Limited Partnership which included as an exhibit the form of promissory note signed by each defendant limited partner and assigned by Mr. Thigpen, provides in Section 11.02 entitled "Applicable Law" that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Florida." Mr. Thigpen is a party to that agreement. Nashville City Bank as assignee is the successor to Mr. Thigpen's interest in said promissory notes; like Mr. Thigpen, Nashville City Bank is bound by the terms of that agreement. 38 Fla.Stat.Ann. 673.3–201(1).

■ It is the general rule that parties may contract or agree as to the law that will apply and their agreement will govern and determine the applicable law unless it is contrary to public policy. Tennessee follows the general rule. *See, Duskin v. Pennsylvania-Central Airlines*, 167 F.2d 727 (6th Cir. 1948), and *Hamilton National Bank of Chattanooga v. Hutcheson*, 357 F.Supp. 114, *aff'd. without opinion*, 492 F.2d 1243 (6th Cir.).

The general rule is consistent with the decision of the Supreme Court of the United States in *Burns Mortgage Co. v. Fried*, 292 U.S. 487, 54 S.Ct. 813, 78 L.Ed. 1380 (1934). There the Supreme Court held that a Pennsylvania United States District Court was required to apply Florida law to a lawsuit commenced by a Pennsylvania transferee of promissory notes executed and delivered in Florida. It is also consist-

ent with the Uniform Commercial Code as adopted in Florida and Tennessee. 19A Fla.Stat.Ann. 671.1–105; Tenn.Code Ann. 47–1–105.

If Florida law did not control, a general partner of a Florida limited partnership unable under Florida law to do what he wants to do could travel to another state whose limited partnership law permits what Florida forbids and there do what he wanted to do but could not do. Justice would obviously not be served if the law permitted such conduct.

Viewed from every direction, Florida law controls this entire case.

## II. *Holder in Due Course Status*

The Uniform Commercial Code of Florida, 38 Fla.Stat.Ann. 673.3–302, hereinafter referred to as the Fla. U.C.C., provides that:

"(1) A holder in due course is a holder who takes the instrument:

(a) For value; and

(b) In good faith; and

(c) Without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person . . . . "

The status of holder in due course is particularly important to plaintiff Nashville City Bank because under § 673.3–305 of the Fla. U.C.C.:

"To the extent that a holder is a holder in due course he *takes the instrument free from*:

(1) All claims to it on the part of any person; and

(2) *All defenses of any party to the instrument* with whom the holder has not dealt except:

(a) Infancy, to the extent that it is a defense to a simple contract; and

(b) Such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and

(c) Such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and

(d) Discharge in insolvency proceedings; and

(e) Any other discharge of which the holder has notice when he takes the instrument." (emphasis added).

If not a holder in due course, Nashville City Bank took and held these notes subject to:

"(1) All valid claims to it on the part of any person; and

(2) *All defenses of any party* which would be available in an action on a simple contract; and

(3) *The defenses of want or failure of consideration,* non-performance of any condition precedent, non-delivery, *or delivery for a special purpose* (§ 673.3–408); and

(4) The defense that he or a person through whom he holds the instrument acquired it by theft, or that payment or satisfaction to such holder would be inconsistent with the terms of a restrictive indorsement. The claim of any third person to the instrument is not otherwise available as a defense to any party liable thereon unless the third person himself defends the action for such party." Fla. U.C.C. § 673.3–306 (emphasis added).

Plaintiff bank unquestionably took these instruments for value. Did it, however, also take them "in good faith" and "without notice?"

The circumstances under which a purchaser or an assignee has legal notice are also specified by Fla. U.C.C. § 673.3–304 which, as here applicable, states:

"(1) The purchaser has notice of a claim or defense if:

(a) The instrument is so incomplete, bears such visible evidence of forgery or alteration, or is otherwise so irregular as to call into question its validity, terms or ownership or to create an ambiguity as to the party to pay; or

(b) The purchaser has notice that the obligation of any party is voidable in whole or in part, or that all parties have been discharged.

(2) The purchaser has notice of a claim against the instrument *when he has knowledge that a fiduciary has negotiated the instrument in payment of or as security for his own debt* or in any transaction for his own benefit or otherwise in breach of duty.

\* \* \* \* \* \*

(4) Knowledge of the following facts does not of itself give the purchaser notice of a defense or claim:

(a) That the instrument is antedated or postdated;

(b) That it was issued or negotiated in return for an executory promise or accompanied by a separate agreement, unless the purchaser has notice that a defense or claim has arisen from the terms thereof;

(c) That any party has signed for accommodation;

(d) That an incomplete instrument has been completed, unless the purchaser has notice of any improper completion;

(e) That any person negotiating the instrument is or was a fiduciary;

(f) That there has been default in payment of interest on the instrument or in payment of any other instrument, except one of the same series.

(5) The filing or recording of a document does not of itself constitute notice within the provisions of this chapter to a person who would otherwise be a holder in due course.

(6) To be effective notice must be received at such time and in such manner as to give a reasonable opportunity to act on it." (emphasis added).

Plaintiff bank made its loan to W. R. Thigpen. W. R. Thigpen signed plaintiff bank's promissory note, and the entire proceeds were paid to W. R. Thigpen. In all respects plaintiff bank made a personal loan to W. R. Thigpen and accepted assignments of promissory notes payable to Oak Winds, a Limited Partnership, as security for Mr. Thigpen's "own debt." That the assignments are executed by Mr. Thigpen as general partner for and in behalf of the limited partnership does not in any way

alter this conclusion. At best the assignment in the name of the partnership was "window dressing," which does not alter the fact that Mr. Thigpen individually borrowed and individually received the money now represented by plaintiff bank's promissory note for his personal benefit.

■ Mr. Thigpen as general partner of Oak Winds, a Limited Partnership, like all general partners of all limited partnerships, in handling partnership affairs was a fiduciary—a person in whom trust and confidence has been reposed on account of which scrupulous good faith and candor is required. *See, Palmer v. Fuqua*, 641 F.2d 1146 (5th Cir. 1981). As *Palmer* holds, that was particularly true of Mr. Thigpen because he was, and the plaintiff bank knew from the papers presented by Mr. Thigpen he was, the sole general partner.

■ Having made a personal loan to Mr. Thigpen and having permitted him as general partner—a fiduciary—to assign promissory notes which were payable to the limited partnership as security for his personal loan, the plaintiff bank, as a matter of law, took each of the promissory notes with "notice of a claim against the instrument" and thus is not a holder in due course.

■ An equally if not more compelling reason for finding the plaintiff bank does not have the rights of a holder in due course, is the court's conclusion that the plaintiff bank, having been furnished with the Restated Certificate and Agreement of Limited Partnership, had actual knowledge and notice of the total lack of authority of the general partner to assign the limited partnership's notes as security for his personal loan.

The partnership purpose—"to develop, construct, own, maintain and operate a 456 unit multi-family rental housing development ... in the City of Clearwater, Pinellas County, Florida ..." was set forth in Section 2.01.

Section 5.02 described Powers of the General Partner and included in (a)(iv) the power to "borrow money, and to issue evidence of indebtedness and to secure the same by mortgage, pledge or other lien, *in furtherance of the Partnership's purposes and business* ...." (emphasis added). Paragraph (a)(xiii) included the following power:

"(xiii) at any time after the delivery by the Limited Partners of their promissory notes as provided in Section 4.03(b), the General Partner shall have the right *to cause the Partnership to borrow* in a principal amount not in excess of the then outstanding balance of said promissory notes, which loans shall be repaid out of the proceeds of collection of the promissory notes delivered by the Limited Partners. *The Partnership shall have the right to issue evidences of such indebtedness* and to secure the same by assignment or pledge of the above-described promissory notes."

It was "as plain as day" that it was neither the purpose nor the business of this limited partnership to finance the sole general partner in his individual endeavors to develop an apartment complex in Nashville, Tennessee. The partnership clearly had the authority to borrow money, to issue evidences of such indebtedness, and to assign or pledge limited partners capital contribution notes as security for the debt of the partnership; Mr. Thigpen clearly did not have the authority to assign or pledge such notes as security for his personal indebtedness. Plaintiff bank knew that Mr. Thigpen was proceeding as an individual, knew of his powers as a general partner, and thus in turn knew that he had no authority to assign these limited partnership notes as security for his personal loan to fund his personal endeavors.

All was capable of being objectively ascertained by plaintiff bank, was objectively ascertained, and thus constituted actual notice of infirmities making the plaintiff bank one who took these notes with actual notice. As such the bank received them in bad faith and is not a holder in due course. *See*, Fla. U.C.C. § 673.3–119.

### III. *Defenses of Limited Partners*

Each of the promissory notes assigned to plaintiff bank were given to the limited

partnership in payment of capital contributions. The Restated Certificate and Agreement plainly said so. The plaintiff bank being other than a holder in due course holds subject to "(2) All defenses of any party which would be available in an action on a simple contract; and (3) The defenses of want or failure of consideration, non-performance of any condition precedent, non-delivery, or delivery for a special purpose . . . ." Fla. U.C.C. § 673.3–306.

Creditors of a limited partnership may make claims against a limited partner for any unpaid contribution which a limited partner agreed to make. 34 Fla.Stat.Ann. § 620.17. The construction lender bank thus properly demanded and received funds of the partnership representing the unpaid, agreed-to-be-made contributions of the limited partners and used them to pay for the construction of the partnership's apartments.

■ The consideration for each promissory note was an interest in a limited partnership which was building and financing a 456 unit apartment complex. Mr. Thigpen and plaintiff bank as his assignee, by attempting to improperly withdraw capital funds of the partnership caused the partnership to be without capital funds to complete and finance the project. As between Mr. Thigpen and defendant limited partners there was thus a failure of consideration. Even if such notes had not been paid and the money used for the purposes of the partnership, payment to Mr. Thigpen and plaintiff bank would not be required unless plaintiff bank could show an extension of credit to the partnership and unpaid contributions by the limited partners. The bank extended credit to Mr. Thigpen individually and personally; credit was in no way—directly or indirectly—extended to the partnership.

■ Each defendant limited partner has a good defense [5] to the claim asserted by plaintiff bank and is thus entitled to a judgment in his favor and against plaintiff bank.

5. There are other possible defenses asserted but not considered since those considered are

The remaining two defendants, Piedmont, Inc. and W. H. Arnold, are in no way legally responsible to plaintiff bank for anything and are accordingly entitled to judgment in their favor and against plaintiff bank.

■ Unauthorized signatures of Mr. Thigpen as general partner being "wholly inoperative," Fla. U.C.C. § 673.3–404, and the defendants in no way having by their negligence contributed to the making of the unauthorized signatures, Fla. U.C.C. § 673.-3–406, the assignment of each note of Oak Winds, a Limited Partnership, to plaintiff Nashville City Bank by W. R. Thigpen as general partner is hereby rescinded. Said notes shall be marked "paid in full as a result of the judgment of the United States District Court for the Middle District of Georgia" and delivered to the defendants within fifteen (15) days.

Plaintiff shall pay all costs and such attorneys fees as may be allowed by law.

SO ORDERED.

found to constitute complete defenses.